May it please the Court, Deanne Maynard for the Appellant, International Game Technology. I hope to save a few minutes for rebuttal. We've briefed in our briefing multiple reversible errors, and I'm happy to answer questions about any of them, but I'd like to focus on three arguments, if I may, this afternoon. First, the plaintiff's was not objectively reasonable as a matter of law for these experienced patent attorneys to jump to the conclusion that shareholder fraud had incurred without first doing an inquiry into whether any withholding was deliberate and whether the prior art, in fact, was invalidating. Second, even if this Court were to uphold liability, Sean Van Asdale's damages must be set aside for his failure to mitigate. And third, at the very least, the interest award should be set aside because the district court applied the wrong statute, resulting in a $900,000 windfall to the plaintiffs. If I could start with objectively reasonable. So objective reasonableness is judged against a person with the same training and experience as the plaintiffs. And here, no reasonable attorney with the training experience of these plaintiffs would have jumped to the conclusion that shareholder fraud had occurred without doing more. Indeed, we know that because the plaintiffs stopped the inquiries of other attorneys who wanted to look into it. So, for example, they had two outside attorneys who testified in the trial. One was an outside patent litigator from Kirkland & Ellis who had been hired by Sean Van Asdale, one of the plaintiffs, and then Marty Hirsch, who was their outside patent prosecuting attorney, who had been hired by Leonard Van Asdale. Each of them, when they found out about the, what we call the Australian flyer, or the handful of documents that are at issue as the possible prior art that showed up in the files of anchors outside patent prosecutor Joe Walkowski, the lawyers from Kirkland & Ellis and the patent prosecutor, they both wanted to inquire further. So Marty Hirsch wanted to call up Joe Walkowski, Marty Hirsch being the outside patent prosecutor, and say, inquire why the documents hadn't been sent earlier. And Leonard Van Asdale told him not to do that. And that was her testimony. She told him not to do that. Marty Hirsch as well, I mean, I'm sorry, Barry Irwin, who was the Kirkland & Ellis attorney, he said more inquiry would need to be done to determine whether or not the prior art was actually invalidating. So it's important to understand some patent concepts to understand this case. Prior art, things can be preexisting art, but nevertheless not invalidate a patent. And only invalidating prior art would be relevant to, would be material to the merger. The fact that there was other machines in existence before wouldn't matter if they didn't invalidate the patents. But here, the Van Asdales made no inquiry into why Joe Walkowski had not sent the documents to anyone, even if he had sent the documents to anyone, whether he had made any determinations before the merger as to whether or not the prior art was invalidating or not. And they stopped the inquiry that other reasonable attorneys wanted to make. And instead, they waited for four months until the media, if they found out in August of 2013 about these documents, and our first argument is actually that the evidence shows they were told about these documents before the merger. But for the purposes of this argument, I'm assuming that they didn't know. So if they found out in August of 2013, and then they reported their suspicions of potential fraud four months later, well, these aren't secretaries of the company. These are patent lawyers. One is the director of patent litigation, and one is the director of patent procurement. These documents and these issues were squarely within their bailiwick of responsibility and experience and training. And instead of looking in to why or whether the documents had been turned over and whether the documents in fact might invalidate the anchor patents, they immediately Sean said, almost immediately, jumped to the conclusion that any withholding had been delivered and that the patents were invalidating prior art. Now, even if one assumes that that gets them a subjective belief, sufficient to satisfy the requirement of this Court that they have a subjective belief, it isn't objectively reasonable for someone of their training and experience to leap to that conclusion without first doing an inquiry. That's not something this Court decided when this case was here before. This case was up here before on the question of whether there was a dispute of fact for trial on a limited summary judgment record, and the Court addressed the issues that were presented to it, and this was not one of those issues. This also is a question that is a mixed question of law and fact, and a JMAL – this is a – we're appealing the denial of our judgment as a matter of law on this issue. That's an issue this Court reviews de novo, applying the same standard as the district court. And when one examines this record, there simply is not evidence on which a reasonable jury could find that patent lawyers with the training and experience of the Van Asdaels did enough to have an objectively reasonable belief of shareholder fraud when they supposedly blew the whistle four months after finding out about these documents. And that requires reversal of the judgment. I'm happy to answer any questions the Court has about that argument. I'm happy to answer any questions about the other arguments. Otherwise, I'll move on to the damages argument in interest. So on the damages question, the Van Asdaels expert testified to Sean's damages, and he testified to two pieces, but both of lost compensation, one piece being his lost salary and benefits, and one piece being the inability to vest in his stock options, that his stock options were vested. The jury — and then the jury was instructed that if they found liability, they could award back pay, but that they should deduct from the back pay award any amounts that were — that should have been mitigated. Here, the testimony was that Sean was offered a job, in his words, to essentially run Action Gaming, another company, and the Van Asdaels expert testified that that job package, if he had accepted it, would have been $2.6 million. That's greater than the total of $2.2 million, his max — their own expert's maximum estimate for their damages. The jury awarded the exact amount of the unvested stock options to the dollar. There's no basis for that award. It was a — the award — it's a binary conclusion. He didn't take the job at Action Gaming, which was better than the job he had at IGT and would have paid him more. And they must have found that he — by doing so, he failed to mitigate because they awarded him — they cut his claimed amount of damages and apparently awarded him absolutely nothing for his lost compensation. Did you have any special jury instructions in jury interrogatories? There was no special verdict as to the damages, Your Honor. It was just a general verdict with a blank line for the number. Well, you know we've got some pretty strong law that it's awfully hard to second guess a jury when you're not in the jury room. You're showing an amazing coincidence, but you say it must have been. How am I — how can we say it must have been when we weren't there? Well, because given the evidence and the law as the jury was instructed, there's no way they could have come to any number other — there's no way they could have arrived at this number. So they — as you say, it's — coincidentally, it's $955,597. And how many cents? It doesn't go to cents, Your Honor, just to the dollar. But to the dollar of — that ends in a 7, that's exactly the amount of his unvested stock options. The jury just must have misunderstood somehow. But they were — the instructions were simple. The instructions were back pay in the relevant part of the instructions, where back pay includes the reasonable value of earnings, employment opportunities, benefits, and stock options lost to the present time. So they were — Counsel, if I understand your argument, the jury sort of had one of two ways they could have gone. They either could have awarded the Van Asdaels the 2.2 million, or they could have awarded them nothing, because 2.2 minus less the 2.6 million would be — would be a negative number. And those were sort of their two options. If they were following the law and the evidence as it was presented. Just one clarification. We're just talking about Sean Van Asdaels. Right. Right. But those are sort of the — those are sort of the two logical points that the jury could have come down with. And they came down with something in the middle there. So in some respect, Sean lost something. I mean, the jury — this obviously looks like a jury compromise, but we're — it's all surmising on our part. It looks like a jury compromise. It looks like you got away with something, because they didn't award him $2.2 million. It looks like Sean got away with something, because they didn't award him nothing. And what's the basis for us to overturn this? Well, I think the basis would be, in effect, that no reasonable juror could have concluded that he failed to mitigate here. You know, the evidence essentially was that he was — Did he what? No reasonable juror could have concluded that he — sorry, I put in a negative. Okay. That no reason — a reasonable juror would have had to conclude that he failed to mitigate. There we go. I had to know that I didn't intend. Thank you, Your Honor. Well, and then your argument is that the — is that the — is that Judge McQuaid never should have let this go to the jury and simply should have said, your damages are zero. Right. Or set it aside. That's right, Your Honor. Yes. And that's what we're asking this Court to do. Okay. But doesn't that depend on a jury finding that the Las Vegas offer with — with Action Gaming was a reasonable one and that the damage would have been $2.6 million, the package was $2.6? Well, that's their expert's testimony. So the only evidence was from their expert that $2.6 million is the package from Action Gaming. And — and his expert's calculation of the maximum possible damage, so giving him the benefit of a promotion, was $2.2 million. And so, yes, that the — our argument — Could the jury have said it wasn't reasonable for him to move from Reno to Las Vegas? Not and reduced the number down to the magic number of the stock options. So — I mean, again, it looks a little bit like a compromise verdict by the jury. The jury says, okay, we're not going to give you the benefit of your salary because you didn't take the other job, but we are going to give you the benefit of your stock options. But the question is, what grounds do we have for overturning that? I think the grounds would be that there's no basis in the record to come to anything but a binary conclusion and — and that no reasonable jury could have concluded that he had mitigated. If we agreed with you, we didn't agree with you on issue number one. We have to send this back for a new trial, is that right? On the damages. Right. You know, I think it's a little bit unclear whether we preserved a JMAW motion on the damages question. So there — in the introduction to our judgment that's a matter of law in the trial court, we — we say that we have a statement about the — the — Sean's damages, and it's not developed in that paper, but it is developed in the new trial motion. I think probably the explanation for that is historical, because under the rules, local rules, you have to separate the two motions and initially assign this one. But if you're right, if we — if we disagree with you on the first one, and we agree with you on your second issue, the failure to mitigate question, then what are we supposed to do? I — I was saying that in my — You can't JMAW because you didn't preserve that new trial. If you concluded that we did JMAW, you could — you could reduce it to zero, but otherwise you would have to either offer him a remitter of zero or a new trial. You can't possibly reduce it to zero when there's the possibility the jury might have found that it was 2.2. If we agree with you, maybe we should just award 2.2 million to Sean. That would also be a logical conclusion. I don't think you would like that, would you? Well, I'm not — I don't think the Court could do that because they haven't cross-appealed on the damages on their Federal claim. So only we have appealed the damages amount. So I don't think this Court could increase it. But I do think the remedy would be a new trial. That's a very strange procedural posture, but — But I don't think it's granted. If I could just spend a minute on the interest, which is the district court applied the wrong statutory provision for interest. This argument was not pressed below, but this is the kind of argument that this Court does consider even when not pressed. When you mean pressed, you didn't object? We didn't make — we made the argument that no prejudgment interest should be applied at all, but we did not make the argument that the wrong statute was being proposed by the plaintiffs if the district court was going to give prejudgment interest. So the district court should have applied 28 U.S.C. 1961. The law in this Court is really clear. And it — and instead he applied a regulation that by its terms does not apply here  And it resulted in a $900,000 windfall to the plaintiffs. So they were awarded almost $1.3 million in interest, which is $900,000 more than they should have been awarded. I don't quite get what your argument is. Is it — do I understand correctly, you do not object to that in a district court? We objected only to the award of prejudgment interest generally, but not to the — The amount. Not to the wrong statute. Not to the wrong statute. So your — your — I assume your argument is that that's a question of law and it's preserved automatically? It's a question of law in that you — asking you to overlook the fact that we didn't press it below. Does the plain error standard apply here in the civil litigation? This Court has said that the plain error standard applies, Judge Breyer, but I think the closest case on point is the RTC v. First American Bank case, which is actually cited in the red brief, in which this Court, First American, had not — had not objected to the — to the method of calculation of the interest, had not raised that it should be calculated there by contract instead of by statute. And this Court held because it doesn't require — because it's a question of law, because it doesn't require reopening the record, and because the district court could correct it in summary proceedings, and because it was wrong, this Court reversed and sent it back. And that's what we've asked you to do here, because otherwise they're getting a $900,000 windfall just on interest. It's a huge amount of interest for this claim. Okay. Your time's expired, but we'll give you some time for rebuttal. I appreciate that, Your Honor. Thank you. Thank you, Your Honor. This is kind of an interesting place for me to be because I was the trial lawyer in this case, and I just heard that as a practical matter, no reasonable jury could conclude that the Australian flyer was wrongfully withheld prior to merger and that the Van Asdaels were fired for suggesting an investigation. And that's what this case was about. And on a motion for judgment as a matter of law, if there's substantial evidence  And I'm going to go through this just briefly, why I believe that Sean Van Asdael had a reasonable subjective belief and why I believe he was terminated for even suggesting an investigation. It is very clear that Sean Van Asdael's first knowledge of the Australian flyer was August 12, 2003. That was also the first date that Lena Van Asdael knew about it. She was on the telephone with Mr. Hettinger and Mr. Irwin. When Sean Van Asdael arrived in Chicago, he was told by Barry Irwin and Mr. Krupka that the Australian flyer was prior art and invalidated the triple zero, and they had to stop the litigation. He was actually told that and testified to it, and even Barry Irwin, and his testimony is in our brief. He was also told how Mr. Wachowski was involved and almost three years later came up with an Australian flyer in a matter of minutes. And then there's the trial testimony of Mr. Kovelman and Mr. Wachowski. And this, if you think about it, is one of the best schemes I've ever heard of. Bally says to Anker, who is two and a half months out of a merger, we have this prior art. And they say, oh, well, why don't you have your lawyer, Mr. Kovelman, send it to our lawyer, Mr. Wachowski. Mr. Wachowski had never worked for Anker before, had never worked in gaming before. He was he is, and I don't believe he's a bad gentleman, so don't, I don't want to even put, go try to go there. And they said, you send it to Mr. Wachowski. So Mr. Kovelman and Mr. Wachowski have a conversation and they both testify. Mr. Kovelman reported that Mr. Wachowski reported to me that it was not in his client's interest to litigate this matter. It would be better if they could resolve this matter. And the next thing he heard was a dollar license, which is totally consistent with the position, it's not a good deal. So Mr. Van Asdale hears about this from Barry Erwin. Meanwhile, Mrs. Van Asdale and Barry Erwin and Mark Hettinger have been on the phone, and within a matter of minutes, three years after files have been transferred, he comes up with this. Now, let's kind of keep going forward here. Mr. Van Asdale knew that this document had not been provided pre-merger. He had the – they had – Kirkland and Ellis had the Brobeck records. He had the Anker records. And after the merger, in February of 2002, Ms. Van Asdale said, please send all of the records to Marty Hirsch. This was Mr. Wachowski personally. Thirty-one boxes of records went. Billing records matched, except for this particular day. Mr. Van Asdale did feel almost immediately something had happened, and he thought that the nondisclosure had been deliberate, that there was a potential for fraud, and that Mr. Hettinger was involved. He then had conversations when he returned with Mr. Pennington and Sarah Beth Brown, the general counsel. Mr. Pennington, in that conversation, he clearly suggested that the Australian flyer was wrongfully withheld, that Anker probably knew about the documents pre-merger, and that he felt that IGT had been defrauded in this $1.4 billion merger, and that the and actually, and he thought Mr. Hettinger was involved, and actually Mr. Pennington replied to him, if they had, the control group, had known about this problem with the patent, the merger wouldn't have gone through. There were four people that testified to that, Sarah Beth Brown, Mr. Pennington through Mr. Van Asdale. Keep in mind, they didn't call Mr. Pennington to testify, because possibly these conversations happened and possibly was used in his deposition 17 times. He also, Ward Chilton, who was the vice president, and Bob Bittman, all of them said this merger would not have gone through if there had been a problem with the merger. So then Mr. Pennington told Mr. Van Asdale if he pressed for an investigation, he would probably be fired. And he said if he had to talk about this conversation, he would deny it occurred. Then there was the conversation with Sarah Beth Brown and Mr. and Mrs. Van Asdale. Again, they confirmed that they were not in the O'Melveny records, the Australian flyer, and that Mrs. Brown felt that they should investigate. She also testified that Mr. Van Asdale felt this nondisclosure was deliberate and he did not believe that Hettinger acted alone, and he also knew that Mr. Wachowski was involved and this may go to the top. So all she could tell is that there was something very, very wrong during the premerger period. So then Mr. Johnson spoke with Mr. Pennington on November 23rd, because Mr. Van Asdale was asked by Mr. Pennington to please prepare some slides for the board's review. Mr. Van Asdale then e-mailed Mr. Johnson, what do I do about the CIP miscue, what do I do about this? He never received a reply from Mr. Johnson. Mr. Johnson admitted receiving the slides and deciding that the board of directors didn't need to know this information. The following day on November 24th, 2003, Mr. Johnson and Mr. and Mrs. Van Asdale met. According to Mr. Johnson, they only discussed a fraud on the patent office. That's all they discussed. Mr. Van Asdale explained that there was this August meeting where he met with the control group where Mr. Matthews was then the COO, was president, and also Mr. Johnson also testified that in that same August, Mr. Matthews and Mr. Johnson met in Las Vegas to kind of take care of the Sean problem. Per Mr. Hettinger, in the following meetings in August with Mr. Bittman, he saw the Australian flyer. He never saw the Australian flyer. He had a copy of it. He didn't have a copy of it. He sent it to Sean, and he didn't send it to Sean. And if I may just indulge the Court for one moment at page 30 of Mr. Hettinger's testimony, this was the question. And this was me asking the question. Now, I want to ask you some questions about your knowledge of the Australian flyer. And, Mr. Hettinger, in this case, we're talking about two specific items. One is an old vintage Monte Carlo, and the other is the documentation that was sent by Mr. Kohlman to Mr. Wachowski in October of 2001. Do you understand the distinction? Answer, I do now. Question, and you've never understood the distinction until when? Recently. Question, what's recently mean? Like within the last day. So what was your understanding of what the Australian flyer was and the Monte Carlo machine when you gave your deposition? That they were the same. That they were the same? Well, and that I didn't know any much about either of them, so I just assumed they were the same. Question, so you assumed the vintage Monte Carlo slot machine was the same as the Kohlman documents provided by Mr. Kohlman to Mr. Wachowski. That's what I was thinking. Then he goes on, on page 35. So once you communicated to Mr. McMillan and or Mr. Van Asdale that there was an old vintage Monte Carlo machine out there, you indicated that you told them you were getting prior art from Bally's, that Bally's had offered prior art, yes. Did you explain to Mr. Van Asdale or Mr. McMillan what that prior art consisted of? No, because I didn't know. Now, you're hearing that a reasonable person was saying that there's nothing wrong with that. He also indicated on page 38, did you yourself ever recall receiving the Australian flyer documents? Answer, I do not, other than the deposition when you specifically showed them to me. Now, that's what they're basing this case on, is somehow Sean knew about this document. What we go back to this reasonably subjective belief, and then we have that it wasn't provided, it wasn't provided pre-merger, it wasn't provided post-merger, it was suspiciously produced. He told Mr. Johnson that he thought Hettinger did not act alone and that Mr. Wachowski would have been involved. Johnson replies that Hettinger would be inconceivable if Hettinger didn't know. Then there was discussion about the pre-merger activity and the merger being accomplished through fraud. And he did not talk about fraud on the Patent Office. And the deposition test, excuse me, the trial transcript testimony is very clear on this issue. And the question was, did you have any discussions about the Australian flyer? This is when Mr. Van Asdale was talking with Mr. Johnson. And he talked about his different various states of claim of knowledge. And at that point in the conversation, this is what Mr. Van Asdale says, quote, I relay to Mr. Johnson because this document hadn't been provided by Mark Hettinger to me in my due diligence. It had not been provided by O'Melveny Myers in response to their due diligence request that there appeared to be at least the potential for fraud and that we needed to investigate. Question, was there any further discussions about the potential for I believe at that point the discussion turned along the lines that we didn't think that Mark Hettinger acted alone and it appeared there was at least another person and people involved, specifically Joe Wachowski. And we talked then about, you know, did you use the term shareholder fraud? No. Art Sorbanes-Oxley, no. Whistleblower, no. Question, when you were talking about the potential for fraud, what type of fraud were you trying to communicate to Mr. Johnson? The only type of fraud that we were talking about was the premerger activity. So that would have had a merger that was accompanied through fraud. I said, what about fraud on the patent office? At that point in the conversation, we're even talking about litigation strategy, which was the only way that fraud on the patent office would have been relevant. So at that point in the conversation, I hadn't even mentioned fraud on the patent office. Then they go on and talk about that Mr. Johnson really didn't understand and that a patent lawyer needed to do an investigation. Within three days, the decision was made to terminate him. On December 3rd, he was sent out of the office on business to Chicago, Japan and Australia. He then became ill. In our brief, we set forth Johnson's calendar that reveals all of the reasons why this termination was pretextual and all of the moves that he made, starting from the very day on the 24th of calling the prior counsel, Mr. MacMillan, making arrangements with Mr. MacMillan, going to Vegas, et cetera, et cetera. The jury was basically given the jury instructions that there is direct and circumstantial evidence and that there's really no distinction in the law, that they could use their common sense. That would be Instructions 3 and 4. In Instruction 5, that you give the weight to the testimony that you deem appropriate. You can accept or reject this testimony. And that the witnesses can be discredited or impeached. And you give the credibility and the weight that you want and you can reject this. So now we have to go back and talk about a reasonable leave for security fraud. We have evidence of the value of the patents at $1.4 billion. The primary reason for the merger was the real of gold patents. Once the merger was concluded, all of Anchor's business ventures were sold off or closed down. It was the crown jewel. Even Mr. Johnson was aware of the problems, that if there was a problem with the real of gold patents, that merger would not go through. Even Mr. T.J. Mathews, who signed the 10-Ks, indicated that if this merger didn't go through, it would be detrimental to the Anchor stockholders. There was evidence of a nondisclosure. There was the Kovlman-Wachowski interaction where there was no paper trail. In fact, I asked Mr. Wachowski, when you sent these emails, when you got these emails from Mr. Kovlman, why didn't you push the forward button to Anchor? Why didn't you just push the forward button? Because he was told, very candidly, you know, Joe, just put these in an envelope on your credenza. We'll tell you what to do with them later. And two years and eight months after the merger and three years after the disclosure, he was told, oh, you might want to give these to Barry Irwin. Top manager at Anchor had the financial interest in the nondisclosure the day the deal closed. T.J. Mathews made $9.8 million. Mr. Johnson made $3.8 million. Mr. Hettinger made $650,000. All four of the controlled group who testified, and that would be Pennington through Sean Van Asdale, Mr. Chilton, Mr. Bitton, and Sarah Beth Brown, there would not have been a merger if these documents had been produced. And then, if there was no issue with the Australian Flyer documents and they would have strengthened the patent, you know that they would have been delivered to IGT with a wrapping around them and breaking out the champagne that it would make the patent stronger. These documents were deliberately withheld. Roberts, you're down to about a minute. Do you want to go to other issues? Let me talk about the Sean Van Asdale's damage award. First of all, failure to mitigate is an affirmative defense and is a factual determination. There was evidence in addition to the Action Gaming Office offer, and in that, Sean was IGT tried to impugn Sean's integrity by saying, you know, you stole property from us and you developed a patent and you got a million dollars for this patent, but they could never prove that, they never did anything with it, they never said anything to Sean, and they never filed a lawsuit or even sent a letter. So the jury already knew that he had done something to mitigate his damages because he sold 16 percent of that patent to a competitor of IGT for a million dollars. Then when it came down to the Action Gaming offer, their deal was he could have the job as long as there was, quote, no friction with IGT, unquote. Well, the time he was doing these negotiations, he had filed with OSHA. So there was obviously friction with IGT. And the instructions on number 20 was you could award back pay, including stock options, and then 21A was mitigation of damages, and it says to the jury, you decide whether either plaintiff acted reasonably in not seeking or accepting a particular job. Roberts. So what's your best explanation of how the jury arrived at the offer? My estimation is as speculative as yours. They knew he made a million bucks, so he really didn't lose any damages. It really didn't need to take the other job, and it was not wise of him to take the other job, since there was friction with IGT at that point. And so he mitigated his damages, but he didn't mitigate his stock options. That's what I think happened, but that's as speculative as anybody else's. And this is the one case when a juror would never talk to me. I don't think they talked to either side, so I really can't even give you any juror insight. And how about the interest issue? On the interest issue, IGT never objected in the papers. And what happened in the interest issue, the Court, and I believe this Court has said so in the Platforms Wireless case, that an award of prejudgment interest is reviewed for an abuse of discretion. So we have to determine if Magistrate McQuaid abused his discretion. Well, under the Department of Labor, section 6621 is the appropriate statute. And this case began in the Department of Labor as an OSHA complaint. And because they did not get through in 180 days, we turned to district court. It doesn't change the character of the case. It's still a Sorbanes-Oxley Department of Labor case. And so what I understand about the plain erroneous rule is that it will grant relief if the, quote, "--er seriously affected the fairness, integrity, or public reputation of judicial proceedings." And that was the best that has been cited by the Ninth Circuit. Well, for plain error, you have to have an error that is clear. We don't have that. It has to affect substantial rights. We don't have that. And if not corrected, it would seriously affect the fairness, integrity, or public reputation of the judicial proceedings. Well, under 26 U.S.C. 6621, you can use 3 percent or the 5 percent. And in the Department of Labor proceedings, they could have awarded a 3 percent or a 5 percent, and there's nothing that could be done about it. And the bottom line is IGT never opposed the methodology or the amount. And even if the court miscalculates the interest, it's not plain error requiring reversal or remand. And I'd just like to briefly indicate that we had on our appeal the State penant claims. And just briefly, under Nevada law, a whistleblower has to report to an outside agency. And, of course, Sorbane-Zoxley provides for a protected activity when there is an internal disclosure to a person with supervisory authority and for anti-retaliation provision. And we ask that this situation be certified to the Nevada Supreme Court, because I do believe the Nevada Supreme Court would follow Sorbane-Zoxley, and I do believe that they would have to say that there is not a requirement to go to an outside agency when you're interpreting this particular statute. Do you ask for that certification to the trial court? Oh, yes. Yes. It's been, it was. And what was the ruling? No, it was not granted. Do you think the measure of damages is different under State law? I do. In this case, it's kind of relatively simple to do. We have a jury verdict. We have sufficient facts that the Australian flyer was deliberately withheld. We know that there's a protected activity and we have damages. Now, under Nevada law, there is a potential, a potential for punitive damages, and that is discretionary with the court, and it's three times the special damages. And if a corporation is involved, and I think we can show that there was either conscious disregard or the decision not to advise IGT of the Australian flyer was malice that could be implied, and we have some case law in Nevada on that issue, then there is a potential for three times special damages. And that could be, in this case, as low as the 2.2 tripled or one time or none. I understand this is discretionary with the court. Or it could be as high as $15 million. And so I think the certification issue is a major issue in this case, because I do believe that the Nevada Supreme Court would say, under Sorbanes-Oxley, you don't have to report this to an outside agency. Thank you. What about the prejudgment interest? That's what I talked about under the plain air rule. The prejudgment interest is one of the items of damages under Sorbanes-Oxley. And we made a stipulation in the trial that we would only have the jury do the back up, the attorney fees, the prejudgment interest, and the cost. And so there was a motion for that that was argued, and we lost some money in costs and some money in attorney fees, and the judge then granted the 6621 plus 5 percent, which is basically the U.S. Treasury rate plus 5 percent. Okay. Thank you, counsel. Would you put 5 minutes on the clock, please? We'll even it out. Thank you very much, Your Honor. Just first, there's nothing in the record to support the notion that Joe Walkowski was told to put the papers in an envelope, put it on the credenza, and hold it for 3 years, 8 months, or whatever. In fact, in ER 361 to 364, there are e-mails back from October of 2001 where Walkowski sent Hedinger e-mails saying, I spoke to Bob Kovelman about the Bally's claims, about that they have prior art, and he's going to send me the documents and I'll review them. And, in fact, the Kirkland Ellis lawyer testified that, you know, that when the — when he was inquiring of Joe Walkowski, that Joe Walkowski, you know, was very forthcoming about giving up the documents. So there's no evidence that, to the extent that one would understand counsel's comments to suggest there was direct evidence of that, there wasn't. So — and then also, the evidence shows — so much of what she says doesn't go to the argument I was focusing on this morning, which is the time period from when the Van Asdels first purportedly learned about these documents in August of 2003, and the time they had the meeting with Johnson in late November of 2003, where they were still relying purely on their all-I-had-were suspicions. That's Sean's testimony. And that's four months after finding out about these documents that were directly within his area of responsibility and his wife's area of responsibility. And, in fact, the testimony from the Kirkland Ellis lawyer was that they needed to do more study to determine whether or not the documents were invalidating, but, quote, before we ever did those things, the plug was pulled. And that's at ER 128. He said we needed to authenticate the documents. We needed to figure out if they were ever published and when. And those things are necessary under the patent laws to figure out whether something's invalidating prior art. Marty Hirsch, who was the IGT's outside patent prosecutor, who had been hired by Lena, he wanted to call Joe Walkowski and find out why the documents hadn't been sent, but Lena told him not to. That's Lena's testimony at ER 73 to 74. They never asked, the Van Assels never asked Joe Walkowski why the documents were not disclosed. That's Lena's testimony at ER 74 to 75 and Walkowski's testimony at ER 93. They didn't ask, even though he produced them right away when he was asked about them. Instead, they jumped to the conclusion that it was shareholder fraud. If one applies the standard that — and I recognize that this Court hasn't directly addressed the question, but several circuits have, and the ARB, in fact, still applies the standard, even as recently as the Sylvester decision, that reasonableness — objective reasonableness is judged by the training and experience of the plaintiff. And it makes sense that the law wouldn't protect people who have training and experience to find out about whether their suspicions have any validity before they give them the protections of Sarbanes-Oxley. So on this record, we do think judgment is required for IGT under the correct legal standard, and at the JMAL, this Court applies the law as it should be, regardless of what was said to the jury. So on the — on the interest question, an error of law is an abuse of discretion. Ipso facto. And here, this case is just like the RTC case, where this Court found that the party had waived a claim that the interest was calculated under the wrong formula, but nevertheless remanded, because it's just purely a question of law, doesn't require the district court to reopen the proceedings, can just handle it in a summary fashion. It won't — it's not — it's just an Excel spreadsheet you just hit press, take out the 5 percent interest that was incorrectly added to the percentage rate, which is a tune of $900,000. It isn't necessary to compensate these plaintiffs to make them whole. Every other district court action, other kinds of Federal statutes, other kinds of wrongful terminations under Federal law get the 1961 rate, and that's deemed sufficient to compensate the plaintiffs for the time, value, money, which is different from the disgorgement. Roberts, have you surveyed any other Sarbanes-Oxley cases? We have looked, Your Honor. There just aren't that — there aren't many yet. So is — is Van Asdale's counsel correct that if this had gone through the Department of Labor, it would have gone at the Department of Labor's rate, which is calculated according to the IRC regulations? If — there are ARB decisions where ARB has made decisions where I do believe they have applied within — when — so when it's — if you stay within the Department of Labor, well, then you have a totally different regime. I mean, they don't apply the Federal civil rules. There are lots of other things that are different if you stay within the Department of Labor. And — and it may be that they will apply the statute. I don't know that that's been challenged on appeal yet. It's hard to find that it's plain error if we don't have any other Sarbanes-Oxley cases to know that this is — this is the wrong standard when applied in Sarbanes-Oxley cases that originate in the Department of Labor, where they have a different — where they have a different interest rate. And understand that there's a difference between, you know, internal revenue cases and all the other garden variety cases in that you have two different statutes. And that might be — that might be pretty plain, where you have Sarbanes-Oxley where the DOL refers to the IRC's rate and we don't have any other Sarbanes-Oxley. It's hard to say that that's plain error if we don't have any other cases and this is a fairly new area of law. Well, I think — I think the RTC case isn't applying a plain error standard per se. I think it's looking at and making a statutory interpretation question or, I'm sorry, just making a de novo question as a matter of law. Treating it as a question as a matter of law. What you're urging us, then, is to declare for the first time that in a Sarbanes-Oxley case that has started in the Department of Labor and been kicked to Federal court, that the appropriate rate is the standard 28 U.S.C. rate as opposed to the 26 U.S.C. or 26 CFR, whatever the — whatever that provision is, right? As far as I know, it would be the first time in this Court, yes, Your Honor. And the — but that's not that different, I don't think, from cases that start where you have to file in the EEOC and wait and see if they file your case. And I think if one tracks out Title VII cases, the interest rate awarded under those is 1961. So there's — But in those cases, does the EEOC have a different rate? I don't know, Your Honor. It's not using — it's not using the rate computed by the Treasury Department for internal revenue purposes, right? I don't know. Probably not. So. The regulation, though, by its terms that — on which the plaintiffs are relying and on which the district are relying just doesn't apply by its terms. It talks about — it doesn't even say before the department. It says by the department.  And I think, you know, that may not itself withstand challenge. If I could, just one minute on the Nevada law on — Judge Wallace, to your question. The district court denied their certification request for two reasons. One, it was too late. So they waited until after the judge denied — I mean, granted our motion for summary judgment before they asked him to certify the question. And so he said, well, I've already gone — I've ruled, and now you've found out you lost, and now you want to go find out what the Nevada Supreme Court says. That's too late. And then, two, he said — and this is correct as well, which is an alternative basis to affirm it — which is that the Nevada procedures for certification only accept certification where there's no controlling authority. But here there is. Wiltzie is controlling law, and it says that in order to have a protection under Nevada law for that type of claim, you have to report it outside the company. And we have two instances, one in our brief and one we've found since, where Nevada has refused to reconsider that and broaden that, and there's no basis to reopen that claim here. Thank you, Counsel. Thank you, Your Honor. I appreciate your indulgence. The case just heard will be submitted for decision. Thank you for coming here on the comeback case. I want to thank my colleagues for appearing here this afternoon. They had a busy morning of hearing cases as well, so it's been a long day for us. But we needed to get these cases decided. Thanks. We're adjourned. Thank you.
judges: Wallace, Thomas, Bybee